**William B. DONNELL, Petitioner,**

**v.**

**Harold R. SWENSON, Warden,
Respondent.**

**No. 997.**

United States District Court
W. D. Missouri,
Central Division.

Aug. 23, 1966.

Addendum Oct. 4, 1966.

P. Pierre Dominique, Jefferson City, Mo., for petitioner.

Norman H. Anderson, Atty. Gen., State of Missouri, Howard L. McFadden, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

## MEMORANDUM OPINION

JOHN W. OLIVER, District Judge.

We are required to determine in this habeas corpus proceeding involving an inmate in the Missouri Penitentiary the important question of whether the principles of Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), as read by our controlling court in Bosler v. Swenson, Warden (8th Cir.1966), 363 F.2d 154 (decided July 14, 1966 and not yet reported), are to be applied retroactively. Bosler definitely determined that Missouri's former criminal appellate procedure did not satisfy the teachings of *Douglas*. We are under duty to follow *Bosler*.[1]

The single federal question that will be determined is whether petitioner's rights under the fourteenth amendment to the Constitution of the United States were violated because the State of Missouri failed to appoint appellate counsel

1. Bosler v. Swenson, Warden, was not decided until after the briefs in this case had been filed. We did not call for additional briefs because the Missouri cases upon which respondent relies in this case are the same Missouri cases rejected by the Court of Appeals in *Bosler*. Indeed, State v. Donnell, (Mo.1961) 351 S.W.2d 775, is cited as an example of how the Missouri criminal appellate procedure operates. That case, of course, was the direct appeal of the petitioner involved in this case.

We add this paragraph to what was our final draft of this footnote in order to call attention to Minnesota ex rel. Holscher v. Tahash (8th Cir. 1966), 364 F.2d 922, (decided August 19, 1966 and not yet reported). We were reviewing the final draft of this opinion when we received that slip opinion from the Court of Appeals. The rationale of this most recent Court of Appeals opinion is totally consistent with the other authorities, upon which we have relied. *Holscher*, an opinion by our controlling court, removes any option that District Courts of the Eighth Circuit may have had concerning the controlling question presented by this case. We shall follow and discuss *Holscher* by appropriate insertions in the text of this opinion.

to represent him on his direct appeal of his 1960 conviction.

Determination of that question requires that we answer a second question left open by the Court of Appeals in *Bosler* namely, whether *Douglas,* decided by the Supreme Court in 1963, is to be applied retrospectively in regard to petitioner's 1960 conviction. See State v. Donnell, (Mo., 1961) 351 S.W.2d 775.

■ No question of exhaustion of remedies is presented because the questions here presented were decided by the Supreme Court of Missouri when it affirmed the State trial court's denial of petitioner's Rule 27.26, V.A.M.R. motion. See State v. Donnell (Mo., 1965), 387 S. W.2d 508.[2] Douglas v. People of State of California was first cited on page 511 of 387 S.W.2d, and was specifically discussed on page 513. On the latter page, the Supreme Court of Missouri stated:

Defendant asserts a violation of his constitutional rights in that he was not furnished with counsel on his appeal, as shown in 351 S.W.2d 775, citing Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R. 2d 733. We note, also, Douglas et al. v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811. (387 S.W.2d at 513).

The Supreme Court of Missouri then stated:

The *Gideon* case, which established the right to counsel in the trial of a felony case, was decided on March 18, 1963. The *Douglas* case was decided on March 18, 1963. * * * The judgment and sentence involved here was rendered on September 7, 1960, two and one-half years prior to the ruling in *Douglas* supra, that counsel was there required on appeal. (387 S.W. 2d at 513-514).

The appellate criminal procedures of Missouri held to be constitutionally void by the Eighth Circuit Court of Appeals in *Bosler* were then described in detail, the Supreme Court of Missouri concluding that under those procedures "[i]t is probable that as large a percentage of criminal judgments have been reversed in this Court without counsel, as have been reversed with counsel." It then held:

Under these circumstances, we decline to hold, ex post facto, that this defendant was deprived of any constitutional right because his trial counsel did not brief and argue the case on appeal or because other counsel was not appointed to do so. (387 S.W.2d at 514.)

Petitioner thus exhausted his State court remedies. Familiar law requires that we determine the validity of petitioner's claims under the federal Constitution in this habeas corpus proceeding. Decision of this case should not be delayed. The question presented is involved in numerous other cases that pend in this Court. We suspect that still other cases pend in the Supreme Court of Missouri and various State trial courts because we have seen the question presented in many applications for federal habeas corpus which we have routinely denied without prejudice in order that all State remedies be exhausted. We assume those petitioners have turned to the State courts.

Prompt review and final binding determination of the question involved can not help but be of benefit to courts, both State and federal, and to all other persons required to struggle with well known current problems of administration of criminal justice. Counsel are assured that we will make all requested appropriate orders to expedite appellate review.

I.

In *Bosler,* the Court of Appeals was not required to reach the question of

---

2. Some of petitioner's prior and unsuccessful efforts to obtain a post-conviction evidentiary hearing are summarized on page 515 of 387 S.W.2d. This Court refused to exercise jurisdiction over many more applications for habeas corpus filed by petitioner in this Court until it could fairly be held that petitioner had exhausted his State court remedies.

whether *Douglas* was to be applied retroactively. The factual situation presented in that case was that "Bosler's direct appeal from the conviction had not been decided and was still pending when the *Douglas* decision was announced." "This being the situation," a question of absolute retrospective application of *Douglas* was not presented and the Court of Appeals therefore concluded, per curiam, that "the Supreme Court of Missouri was required to heed and give effect to the teachings of that [*Douglas*] case."

The Court of Appeals determined that the Supreme Court of Missouri, "[h]aving failed so to do [give heed and effect to the teachings of *Douglas*], we are compelled to intervene." The Court of Appeals reversed the District Court's refusal to grant the writ, and ordered the writ to issue unless the State of Missouri take appropriate action within a ninety day period.

This case, unlike *Bosler*, presents a factual situation in which the petitioner's direct appeal was in fact decided before *Douglas*. The affirmance of petitioner's direct appeal was handed down by the Supreme Court of Missouri on November 13, 1961. *Douglas* was not decided by the Supreme Court until March 18, 1963, the same day that court decided the other landmark cases of Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L. R.2d 733 (1963); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837; Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963); and Draper v. State of Washington, 372 U.S. 487, 83 S.Ct. 774, 9 L.Ed.2d 899 (1963).

The refusal of the Supreme Court of Missouri to heed the teachings of Townsend v. Sain required this Court to hold the constitutionally required evidentiary hearing. On August 30, 1965, the Honorable Floyd R. Gibson, now Circuit Judge, but then the District Judge exercising jurisdiction over this case, stated in an order entered that day that:

    * * * [P]etitioner contends that he was denied the right of counsel.

The Missouri Supreme Court found that from arraignment through the preliminary steps of appeal petitioner was represented by counsel. State v. Donnell, 387 S.W.2d 508 (Mo.1965). This finding, however, was not based upon findings at an evidentiary hearing, rather it was merely taken from the record of the case. Therefore, there is a substantial factual dispute as to whether or not petitioner was in fact represented by counsel in all critical stages of the litigation. This dispute has not been given a full hearing by the Missouri courts. Therefore, the duty falls upon this Court to resolve this factual dispute by resort to a hearing. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

Judge Gibson stated in that order that counsel would be appointed to represent the petitioner. Judge Gibson was elevated to the Court of Appeals before the appointment was made. On November 12, 1965, shortly after jurisdiction of this case was assigned to us, we appointed P. Pierre Dominique, Esq., a distinguished member of the Jefferson City Bar, to represent the petitioner. He has represented the petitioner in the highest tradition of the Bar.

In accordance with our customary procedure, we instructed Mr. Dominique to interview the petitioner and to recast the voluminous pro se pleadings in order that all possible questions be raised and presented in an orderly manner in a single evidentiary proceeding. Cf. Sanders v. United States, 373 U.S. 1 at 22, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). See also Swisher v. United States, W.D.Mo. 1965, 237 F.Supp. 921, at 924.

Petitioner, acting for the first time through competent counsel, alleged that he "was denied the benefit of counsel on his direct appeal from his ninety-nine year conviction for first degree robbery under the Habitual Criminal Act in the Supreme Court of Missouri, in violation of the Sixth and Fourteenth Amendments to the Constitution of the United States."

Other serious federal constitutional questions are presented by petitioner's

amended application. We need not reach those questions because of the disposition we make of this case under the command of our controlling court in *Bosler.* We shall, however, point out later that subsequent treatment of one of those questions by the Supreme Court of Missouri must be consistent with the findings of fact made as a result of the evidentiary hearing held in this Court. We, of course, do not intimate that the Supreme Court of Missouri may not order a further hearing at which additional evidence may be adduced that would require a different finding than that which we make in section VI of this opinion.

## II.

It is obvious that we are required to follow the determination of our Court of Appeals in *Bosler* that Missouri's appellate criminal procedure does not satisfy the teachings of *Douglas.* After describing Missouri's appellate criminal procedure in its most favorable light, the Court of Appeals held that: "[a]ll of this, however, does not in our judgment satisfy the dictates of the Supreme Court of the United States." And later in its opinion, the Court of Appeals held that Missouri's "practice, admirable though it may be, does not eliminate the element of discrimination condemned in *Douglas:* '[t]he indigent, where the record is unclear or the errors are hidden, has only the right to a meaningless ritual, while the rich man has a meaningful appeal.' P. 358 of 372 U.S., p. 817 of 83 S.Ct."

██ We determine the question left open in *Bosler* by holding that the *Douglas* principle must, under controlling law, be applied retroactively to this case. (As noted in the second paragraph of footnote 1 above, our consideration of this question is now controlled by the rationale of the August 19, 1966 Court of Appeals' decision in *Holscher*).

It is true, of course, that in a sense *Bosler* applied the *Douglas* principle retroactively in that case. Certainly at the time Bosler filed his direct appeal to the Supreme Court of Missouri neither he nor that court were advised that Missouri's appellate criminal procedure was constitutionally inadequate or that *Douglas* would be handed down by the Supreme Court only three weeks before the Supreme Court of Missouri would have affirmed Bosler's conviction.

But that is not the kind of retrospective application the Supreme Court talks about in the three recent cases that must be applied in this case. The cases are Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), and Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (1966). (The construction given these cases by the Court of Appeals in *Holscher,* of course, is controlling on this Court.)

*Linkletter* held that the rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961), was not to be applied retrospectively as that term was defined by that opinion. Mr. Justice Clark's opinion for the Court suggested that no sharp line could be drawn between the terms "retrospective" and "prospective," because "[a] ruling which is purely prospective does not apply even to the parties before the court" (381 U.S. at 621–622, 85 S.Ct. at 1733). It was obvious that a degree of retrospective application was involved when "[t]he rule announced in *Mapp* [was applied] to reverse Miss Mapp's conviction" (381 U.S. at 622, 85 S.Ct. at 1734).

A case of "absolute retrospectivity" (see footnote 13, page 629 of 381 U.S., 85 S.Ct. 1731 of *Linkletter,* where that term appears) is presented when it must be determined whether a rule announced subsequent to a "final" decision of a State court is to be applied in a post-conviction proceeding commenced in either a State or federal court after the announcement of the rule by the Supreme Court of the United States. Such is the case at bar.

*Linkletter* accepted as a starting point the fact that the Supreme Court had, prior to its decision in that case, "without discussion * * * applied new constitu-

tional rules to cases finalized before the promulgation of the rule" (381 U.S. at 628, 85 S.Ct. at 1737). In footnote 13 on the cited page, the Court called attention to the familiar retrospective application of the principles announced in Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055 (1956), in Eskridge v. Washington State Board of Prison Terms, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958), and to the even more familiar and obvious examples of absolute retrospective applications of the principles announced in Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792 (1963); Doughty v. Maxwell, 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed. 2d 650 (1964); Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964); and Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed. 2d 948 (1961). Incidentally, Lindner v. Nash, Warden, 372 U.S. 777, 83 S.Ct. 1105, 10 L.Ed.2d 138 (1963), is an example of absolute retrospective application of *Gideon* in a certiorari from the Supreme Court of Missouri.

■ *Linkletter* established the rule that judges are "neither required to apply, nor prohibited from applying, a decision retrospectively" (381 U.S. at 629, 85 S.Ct. at 1738). In order that the questions of absolute retrospectivity be determined, judges were directed by *Linkletter* to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether restrospective operation will further or retard its operation" (381 U.S. at 629, 85 S.Ct. at 1738).

Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459 (1966), accepted the analysis of the "competing conceptual and jurisprudential theories bearing on the problem of whether a judicial decision that overturns previously established law is to be given retroactive or only prospective application," as announced in *Linkletter*, and stated:

\* \* \* [W]e take as our starting point *Linkletter*'s conclusion that "the accepted rule today is that in appropriate cases the Court may in the interest

of justice make the rule prospective," that there is "no impediment—constitutional or philosophical—to the use of the same rule in the constitutional area where the exigencies of the situation require such an application," in short that "the Constitution neither prohibits nor requires retrospective effect." Upon that premise, resolution of the issue requires us to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." 381 U.S. at 628–629, 85 S.Ct. at 1737–1738. (382 U.S. at 410, 86 S.Ct. at 461).

*Tehan* added nothing to the rationale of *Linkletter*. Apparently, that opinion was written in language to make that clear. At least, that is how we read *Tehan*.

Johnson v. State of New Jersey, also reiterated the exact language of the two earlier cases, stating that:

In the past year we have twice dealt with the problem of retroactivity in connection with other constitutional rules of criminal procedure. Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965); Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966). These cases establish the principle that in criminal litigation concerning constitutional claims, "the Court may in the interest of justice make the rule prospective \* \* \* where the exigencies of the situation require such an application." 381 U.S., at 628, 85 S.Ct., at 1737; 382 U.S., at 410, 86 S.Ct., at 461. (384 U.S. at 726–727, 86 S.Ct. at 1777).

But Mr. Chief Justice Warren added a bit to the rationale of the two earlier cases when he stated that:

These cases also delineate criteria by which such an issue may be resolved. We must look to the purpose of our new standards governing police interrogation, the reliance which may have been placed upon prior decisions on the

subject, and the effect on the administration of justice of a retroactive application of *Escobedo* and *Miranda*. See 382 U.S., at 636, 85 S.Ct., at 1741; 382 U.S., at 413, 86 S.Ct., at 464. (384 U.S. at 727, 86 S.Ct. at 1777).

A portion of *Johnson*, however, used new language not theretofore expressly used in *Linkletter* or *Tehan*. Mr. Chief Justice Warren stated:

> Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved. Accordingly as *Linkletter* and *Tehan* suggest, we must determine retroactivity "in each case" by looking to the peculiar traits of the specific "rule in question." 381 U.S., at 629, 85 S.Ct., at 1737; 382 U.S., at 410, 86 S.Ct., at 461. [34 L.W. 4595].

Consistent with what we understand is the command of the Supreme Court, we must examine the purpose of the principles stated in Douglas v. California, the evolution of the principles there applied, as developed in prior Supreme Court decisions, and the impact that a retrospective application of the *Douglas* principle would have on the administration of justice.

### III.

The obvious purpose of the rule of *Douglas* is so intertwined with its history that both may be discussed together. *Douglas* specifically held that a rule of State appellate criminal procedure that required the appointment of appellate counsel for an indigent defendant only on request and only after an independent investigation of the record by the State appellate court convinced such court that the appointment of counsel would be helpful either to the defendant or the court violated the fourteenth amendment to the Constitution of the United States. But that specific holding was an application of a much broader constitutional principle.

The rule of *Douglas* was but a different factual application of the fundamental principle established over ten years ago in Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055 (1956). And *Griffin*, of course, rested on the earlier cases it cited and relied upon.

■ *Griffin* made clear to all the States that the Due Process and Equal Protection Clauses of the fourteenth amendment applied to appellate review of criminal convictions with the same vigor as they applied to the trial of criminal cases. See 351 U.S. at 18, 76 S.Ct. at 590, where *Griffin* held that:

> All of the States now provide some method of appeal from criminal convictions, recognizing the importance of appellate review to a correct adjudication of guilt or innocence. Statistics show that a substantial proportion of criminal convictions are reversed by state appellate courts. Thus to deny adequate review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside.

Over ten years ago, *Griffin* pointed out that "[m]any States have recognized this and provided aid for convicted defendants who have a right to appeal and need a transcript but are unable to pay it." In regard to the few States that had not, Mr. Justice Black stated:

> Such a denial is a misfit in a country dedicated to affording equal justice to all and special privileges to none in the administration of its criminal law. There can be no equal justice where the kind of trial a man gets depends on the amount of money he has. Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts.

The idea that aid for convicted indigent defendants was not to be confined to a factual situation that happened to involve transcripts of the record is made

apparent by Mr. Justice Frankfurter's concurring opinion. He there stated:

Law addresses itself to actualities. * * * A man of means may be able to afford the retention of an expensive, able counsel not within reach of a poor man's purse. Those are contingencies of life which are hardly within the power, let alone the duty, of a State to correct or cushion. But when a State deems it wise and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes convicted indigent persons, forsooth erroneously convicted, from securing such a review merely by disabling them from bringing to the notice of an appellate tribunal errors of the trial court which would upset the conviction were practical opportunity for review not foreclosed. (351 U.S. at 23, 76 S.Ct. at 592).

Mr. Justice Frankfurter departed from the majority opinion only on the question of whether the rule of *Griffin* should be applied with absolute retrospectivity, a matter about which he had a good deal to say. See 351 U.S. at 25–26, 76 S.Ct. 585. But the depth of Mr. Justice Frankfurter's conviction on the merits of the broad question of principle presented is evidenced by the following:

To sanction such a ruthless consequence, inevitably resulting from a money hurdle erected by a State, would justify a latter-day Anatole France to add one more item to his ironic comments on the "majestic equality" of the law. "The law, in its majestic equality, forbids the rich as well as the poor to sleep under bridges, to beg in the streets, and to steal bread." (John Cournos, A Modern Plutarch, p. 27.) (351 U.S. at 23, 76 S.Ct. at 593).

Douglas v. People of State of California expressly noted that "[i]n Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055, we held that a State may not grant appellate review in such a way as to discriminate against some convicted defendants on account of their poverty" and

that the factual issue that was there involved was "the right to a free transcript on appeal" (372 U.S. at 355, 83 S.Ct. at 815). The issue in *Douglas* varied only in factual degree from that involved in *Griffin* and presented the question of whether a system of State appellate review under which "the rich man can require the court to listen to argument of counsel before deciding on the merits, but a poor man cannot" draws "an unconstitutional line . . . between rich and poor" (372 U.S. at 357, 83 S.Ct. at 816). The Supreme Court stated in *Douglas* that "where the rich man, who appeals as of right, enjoys the benefit of counsel's examination into the record, research of the law, and marshalling of arguments on his behalf, while the indigent, already burdened by a preliminary determination that his case is without merit, is forced to shift for himself" (372 U.S. at 358, 83 S.Ct. at 817).

Under such a system of State appellate criminal review, *Douglas* held that "[t]he indigent, where the record is unclear or the errors are hidden, has only the right to a meaningless ritual, while the rich man has a meaningful appeal" (372 U.S. at 358, 83 S.Ct. at 817). In the whole group of cases decided March 18, 1963, of which *Douglas* was but one, the Supreme Court examined and ruled on many facets of the basic problem of whether the criminal law was being administered in a meaningful manner consistent with long existing State and federal constitutional guarantees or whether the administration of particular systems of criminal law were meaningless rituals that violated both the letter and spirit of those constitutional guarantees.

Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963), another of the cases decided that same day, for example struck down Indiana's rule of criminal procedure that left to the Public Defender the decision of whether an indigent defendant could appeal as a matter of right. In addition to the broad principle applied in Griffin v. People of State of Illinois, Mr. Justice Stewart relied upon Burns v. State of Ohio, 360 U.S. 252, 79

S.Ct. 1164, 3 L.Ed.2d 1209 (1959), which held that "once a State chooses to establish appellate review in criminal cases, it may not foreclose indigents from access *to any phase* of that procedure because of their poverty." Id. at 257, 79 S.Ct. at 1168 (emphasis ours); Smith v. Bennett, 365 U.S. 708, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961), which held that the broad principle under discussion was not limited to direct appeals but extended to and were applicable to post-conviction proceeding; and Eskridge v. Washington State Board of Prison Terms, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269 (1958), which held that a provision in the State of Washington's criminal appellate system that purported to vest power in the trial judge to withhold a free transcript if he did not believe justice would be promoted was constitutionally void. In regard to those cases Mr. Justice Stewart held in Lane v. Brown that:

> The present case falls clearly within the area staked out by the Court's decisions in *Griffin, Burns, Smith,* and *Eskridge.* To be sure, this case does not involve, as did *Griffin,* a direct appeal from a criminal conviction, but *Smith* makes clear that the *Griffin* principle also applies to state collateral proceedings, and *Burns* leaves no doubt that the principle applies even though the State has already provided one review on the merits. (372 U.S. at 484, 83 S.Ct. at 773).

We believe that Lane v. Brown's reliance upon *Eskridge,* decided in 1958, is particularly significant because that case involved a very conscious retrospective application of *Griffin* to a case tried in 1935. The dissent of Mr. Justice Harlan and Mr. Justice Whittaker in *Eskridge* was based solely on the ground that they believed that "the *Griffin* case, decided in 1956, should not be applied to this conviction occurring in 1935" (357 U.S. at 216, 78 S.Ct. at 1062).

We cannot escape either the logic or the experience of the proposition that the purpose of having a lawyer on appeal and the purpose of having a lawyer at the time of trial is the same. The Supreme Court decided Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932), thirty years ago. It was Mr. Justice Sutherland who traced the history and purpose of the right of counsel. On page 60 of 287 U.S., on page 61 of 53 S.Ct., he noted:

> Originally, in England, a person charged with treason or felony was denied the aid of counsel, except in respect of legal questions which the accused himself might suggest. At the same time parties in civil cases and persons accused of misdemeanors were entitled to the full assistance of counsel. After the revolution of 1688, the rule was abolished as to treason, but was otherwise steadily adhered to until 1836, when by act of Parliament the full right was granted in respect of felonies generally.

Mr. Justice Sutherland noted that "[o]ne of the grounds upon which Lord Coke defended the rule [as it existed in England prior to 1836] was that in felonies the court itself was counsel for the prisoner." He rejected the argument by asking: "But how can a judge, whose functions are purely judicial, effectively discharge the obligations of counsel for the accused?" (287 U.S. at 61, 53 S.Ct. at 61). He relied principally on Cooley's great work on Constitutional Limitations, 8th Edition, 698, et seq. and notes.

Cooley's notes on the cited pages show that he described the early English practice of refusing a defendant counsel was a "barbarity" and that the idea that an English judge could be effective counsel for the prisoner was as "a pure fallacy at best, and with some judges, a frightful mockery" (see note 1 on page 698 and note 2 on page 669 of Cooley).

Francis J. Morrissey, Jr., in his article "Escobedo's European Ancestors," in the current issue of the American Bar Association Journal, 52 A.B.A.J. 723 at 725 (August, 1966), pointed out "the futility of relying on the court to protect the accused." He quotes the opinion of Justice Riddle on how the English theory was applied in practice in cases tried before

the well known Lord Jeffreys. Such a theory, Justice Riddle was quoted as saying:

> * * * was quite as reasonable, and displayed quite the same touching confidence in human nature, as the proposition that the Judge shall take care that the tortured are not crippled by their torturers. The torturers took the same care in this regard as Jeffreys did for Alice Lisle. (P. 725 of A.B. A.J., August, 1966).

Footnote 22 on the same page tells us what happened to Alice Lisle. It is there stated in part that:

> In 1685, Alice Lisle then aged seventy, after a brutal trial before Jeffreys in which she was not represented by counsel, was convicted of harboring two unimportant associates of the rebellious Duke of Monmouth. Jeffreys sentenced her to be burned alive the same afternoon, but, in an exercise of royal clemency, James II commuted the penalty to beheading. After a brief respite, that was duly carried out. (P. 725 of 52 A.B.A.J., August, 1966).

Mr. Justice Sutherland pointed out in Powell v. State of Alabama in 1932 that the English rule was firmly rejected by the Colonies and that long before the adoption of the federal Constitution, particular Colonies guaranteed the right of counsel to all defendants. In a footnote on page 63 of 287 U.S., 53 S.Ct. 55, Mr. Justice Sutherland quoted, with approval, Zephaniah Swift's comment on the reasons why Connecticut had rejected the English rule. Swift, writing over a hundred and seventy years ago, said that:

> The flimsy pretence, that the court are to be counsel for the prisoner will only highten [sic] our indignation at the practice: for it is apparent to the least consideration, that a court can never furnish a person accused of a crime with the advice, and assistance necessary to make his defense. (287 U.S. at 63, 53 S.Ct. at 62).

On the basis of its full historical review, the Supreme Court held over a quarter of a century ago that "[h]istori-cally and in practice, in our own country at least, [a hearing] has always included the right to the aid of counsel when desired and provided by the party asserting the right" (287 U.S. at 68, 53 S.Ct. at 64). It added that "[t]he right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel" (287 U.S. 68–69, 53 S.Ct. at 64).

The following passage from Powell v. State of Alabama was quoted in Gideon v. Wainwright, 372 U.S. at 345, 83 S.Ct. at 797, 9 L.Ed.2d 799, 93 A.L.R.2d 733, and could just as aptly have been quoted in *Douglas*:

> Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence.

The purpose of the constitutional rule that guarantees counsel in both the trial and appellate court in criminal proceedings is to make certain that one who "lacks both the skill and knowledge adequately to prepare his defense" be afforded "the guiding hand of counsel at every step in the proceeding against him," to borrow again the words of Mr. Justice Sutherland.

Our American system of jurisprudence is based upon the fundamental assumption that the rights of the innocent must be constitutionally protected and safeguarded by an adversary system of criminal law administration and that such a

system is a viable one only if the contesting parties are represented by competent counsel. Anything less would convert our adversary system of criminal justice into an inquisitorial system unknown to American jurisprudence.[3]

Of all the criteria suggested in *Linkletter, Tehan* and *Johnson,* we believe two passages in *Tehan* reveal most clearly why we are required to apply Douglas v. People of State of California retrospectively. On page 415 of 382 U.S., on page 464 of 86 S.Ct., Mr. Justice Stewart stated that because "the basic purposes that lie behind the privilege against self-incrimination do *not* relate to protecting the innocent from conviction" the rule of Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), should not be applied retrospectively.

On page 416 of 382 U.S., on page 465 of 86 S.Ct., Mr. Justice Stewart put Griffin v. People of State of California in the same category as the rule of Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933 (1961). Both were held to rest on "considerations of quite a different order from those underlying other recent constitutional decisions which have been applied retroactively" (382 U.S. at 416, 86 S.Ct. at 465). Mr. Justice Stewart then immediately added:

The basic purpose of a trial is the determination of truth, and it is self-evident that to deny a lawyer's help through the technical intricacies of a criminal trial or to deny a full opportunity to appeal a conviction because the accused is poor is to impede that purpose and to infect a criminal proceeding with the clear danger of convicting the innocent. See Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733; Doughty v. Maxwell, 376 U.S. 202, 84 S.Ct. 702, 11 L.Ed.2d 650; Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R. 2d 1055; Eskridge v. Washington State Board of Prison Terms & Paroles, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269. The same can surely be said of the wrongful use of a coerced confession. See Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205; McNerlin v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 1041; Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948.

In the final analysis, the question of whether *Douglas* should be applied retrospectively turns on whether denial of counsel on appeal is to be equated with the broad principles recognized in Griffin v. People of State of Illinois and Gideon v. Wainwright, which are to be applied retrospectively, or with *Mapp,* Griffin v. People of State of California, *Escobedo,* and *Miranda,* which are to be applied only prospectively. Logic dictates that *Douglas* belongs with *Gideon,* Griffin v. People of State of Illinois, and the other cases which are cited by *Tehan* as having absolute retrospective application.

---

**3.** Professor Jules B. Gerard, in his article "The Right to Counsel on Appeal in Missouri: A Limited Inquiry into the Factual and Theoretical Underpinnings of Douglas v. California," 1965 Wash.U.L. J. 463, 482–483, states that the contention that "the indigent is better off because the Attorney General briefs, and the court considers, many more possible grounds for error" if he is without counsel "is so obviously specious that it hardly warrants comment." He does, however, comment by adding: "How can one be sure that the real determinant of these appeals is not the strength of the Attorney General's brief?

The Anglo-American legal system is founded on the theory that the best way of arriving at truth is to have two advocates make the strongest possible arguments on opposite sides of a question. Why, then, should it be complacently assumed that judges of the Supreme Court of Missouri have a talent denied all other judges, namely, that of conjuring up arguments in opposition to one side of a question about which they are supposed to be impartial?"

See also the same author's related articles "A Preliminary Report on the Defense of Indigents in Missouri," 1964 Wash.U.L.Q. 271, and "Some Factors Influencing the Outcome of Felony Appeals in Missouri," 1966 Wash.U.L.Q. 59.

Having counsel on appeal does "relate to protecting the innocent from conviction" (*Tehan*, 382 U.S. at 415, 86 S.Ct. at 464), and to "the very integrity of the fact-finding process" (*Linkletter*, 381 U.S. at 639, 85 S.Ct. at 1743).

We hold that *Douglas* must be applied retrospectively to this and other factually similar cases.

Because in footnote 10 on page 729 of 384 U.S. on page 1779 of 86 S.Ct., reporting Johnson v. State of New Jersey, the Supreme Court commented on the fact that State and federal courts had consistently "declined to apply the tenets of *Escobedo* retroactively," and in the absence of any then controlling decision by the Eighth Circuit Court of Appeals, we felt it important that like data be noted in regard to how other courts have applied the *Douglas* principle. Those cases are collected in the next section of this opinion. In the final draft of this opinion that section immediately followed the preceding paragraph.

We insert our discussion of the most recent *Holscher* opinion at this point because it is the first Eighth Circuit case that we have seen in which the Supreme Court's June 20, 1966 decision in *Johnson* is discussed. Holscher was convicted of first degree murder in Minnesota in 1959. The Court of Appeals' review centered "upon the application of *Escobedo* v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, 1 A.L.R.3d 1205 (1964), to Holscher's facts."

The District Court held "that *Escobedo* and *Jackson* are not retroactive or applicable to Holscher 'since his conviction became final before the decisions in those cases'." The Court of Appeals withheld decision until *Miranda* and *Johnson* were handed down by the Supreme Court. *Johnson*, of course, solved the *Escobedo* issue and the Court of Appeals so held: "Johnson v. State of New Jersey * * * held that *Escobedo* * * * and *Miranda* * * * are not to be applied retroactively * * *."

But in regard to the problem of confessions, the Court of Appeals reversed the District Court, holding:

Jackson v. Denno presents a different problem. The decision in *Jackson*, by which the New York procedure of leaving to the trial jury the determination of the voluntary character of a confession was held violative of federal due process, seemed to us to be so fundamental and so directed to "the very integrity of the fact-finding process", see Linkletter v. Walker, 381 U.S. 618, 639, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), as necessarily to be retrospective in application. (State of Minnesota ex rel. Holscher v. Tahash, Warden, 8 Cir., 364 F.2d 922 decided August 19, 1966.)

Judge Blackmun noted that the Eighth Circuit had applied Jackson v. Denno retroactively some months ago in Mitchell v. Stephens, 8th Cir. 1965, 353 F.2d 129, cert. denied 384 U.S. 1019, 86 S.Ct. 1966, 16 L.Ed.2d 1042, involving an Arkansas conviction, but that subsequent to that decision the Supreme Court of Minnesota had held that Jackson v. Denno was not to be applied retroactively. State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N.W.2d 3, 10–11 (1965). While that decision gave Judge Blackmun "reason to pause," he nevertheless reached the same conclusion in regard to how Jackson v. Denno, must be applied as we reached in regard to *Douglas*. The following paragraph from *Holscher* illustrates that rationale supporting both conclusions is essentially the same:

With the Supreme Court's decision in Johnson v. State of New Jersey, supra, the retrospective character of Jackson v. Denno now seems clearly established. The Court there, as we have noted, was primarily concerned with the question of retrospective application of Escobedo and Miranda. It cited Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A.L.R.2d 733 (1963), and Jackson v. Denno, however, as examples where the Court had "given retroactive effect to other constitutional rules of criminal

procedure laid down in recent years". It also said, "We gave retroactive effect to Jackson v. Denno, supra, because confessions are likely to be highly persuasive with a jury, and if coerced they may well be untrustworthy by their very nature". Despite the intervening contrary holding by the Supreme Court of Minnesota in State ex rel. Rasmussen v. Tahash, supra, we therefore affirm our conclusion expressed in Mitchell v. Stephens, supra, that Jackson v. Denno is indeed not limited to prospective operation. (Id. pages 8–9).

We, of course, reasoned from *Tehan* because that case placed Griffin v. People of State of Illinois and the other appellate procedure cases in the group of cases that must be applied retrospectively. *Johnson* did not happen to cite *Griffin*. It did cite Jackson v. Denno and because it also dealt specifically with *Escobedo*, we suspect that it was for that reason that Judge Blackmun reasoned from *Johnson* rather than *Tehan*. The whole point is that although *Holscher* involved the principle of Jackson v. Denno and in this case that of *Douglas*, the rationale under which the Court of Appeals was required to apply Jackson v. Denno retrospectively commands that this Court make like application of *Douglas*. Further discussion of *Holscher* would be redundant.

### IV.

So far as we know, this is the first case in which it must be considered whether the rationale of *Linkletter*, *Tehan* and *Johnson* requires that the principle of *Douglas* not be applied retrospectively. Before those three cases were decided the principle of *Douglas* was almost universally applied retrospectively.

Every decision of every court, except the Supreme Court of Missouri in petitioner's Rule 27.26 appeal, and the Supreme Court of Kansas in a case to be presently mentioned, that has ruled the retrospective application of *Douglas* has so applied that case. The answer has been so obvious to many of those courts that the question of retrospectivity was not even discussed.

Other than State v. Donnell, Mo., 387 S.W.2d 508, involved in this case, Smith v. Crouse, 192 Kan. 171, 386 P.2d 295 (1963) is the only other case that refused to apply *Douglas* with absolute retrospectivity. And that case was reversed outright by the Supreme Court before the Supreme Court of Missouri decided its second State v. Donnell. In Smith v. Crouse, the defendant was convicted of burglary in 1960. In an appeal from a denial of habeas corpus the petitioner contended that Douglas v. California "has retrospective application and thus 'refers back' to 1960." The Supreme Court of Kansas noted that "the *Douglas* case is silent on the matter of its retrospective application." In affirming the denial of habeas corpus the Supreme Court of Kansas held:

It is clear that only the Supreme Court of the United States can give a definite and authoritative answer to the question whether the rule of the *Douglas* case is to be applied retrospectively. If so applied, however, the practical effect may well be to require the reopening of criminal cases long since finally adjudicated. We believe that, as applied to the facts before us, the contention advanced in some quarters that later decisions of a court "were always the law," overlooks and departs from reality, and until directed by the Supreme Court of the United States to construe the *Douglas* case as having retrospective application—we decline to do so. (386 P.2d at 301).

The Supreme Court gave its definite and authoritative answer in Smith v. Crouse, Warden, 378 U.S. 584, 84 S.Ct. 1929, 12 L.Ed.2d 1039 (1964), in a two sentence per curiam opinion that reads:

The motion for leave to proceed *in forma pauperis* and the petition for writ of certiorari are granted. The judgment is reversed. Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811.

Mr. Justice Harlan was the only dissenting judge. His dissent makes clear, if indeed it needed to be made clear, that the Supreme Court was knowingly order-

ing an absolute retrospective application of *Douglas*. He stated that "[i]n my opinion the question whether Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811, should be given retroactive application is deserving of plenary consideration." The eight other justices obviously thought otherwise.

Judge Wesley E. Brown in Spaulding v. Taylor, D.C.Kan.1964, 234 F.Supp. 747, held that Douglas v. People of State of California "means an indigent defendant has an *unqualified right* to the assistance of counsel on appeal." (Emphasis Judge Brown's.) Judge Brown stated that "[w]e frankly doubt that furnishing petitioner with an appellate attorney would have then changed or would now change the outcome of the appeal" but stated that he was precluded from asking such a question by the Supreme Court decisions in *Douglas* and in Smith v. Crouse. He held that "the mandate of Smith v. Crouse, supra, seems clear to us that *Douglas* is to be given retrospective application."

The Court of Appeals for the Fifth Circuit in Pate v. Holman (5th Cir. 1965), 341 F.2d 764, discussed the question of retroactivity in some detail. It noted that while it had applied *Mapp* prospectively in United States ex rel. Linkletter v. Walker, (5 Cir., 323 F.2d 11), later to be affirmed by the Supreme Court, such a case should be distinguished from the application of the *Douglas* principle because the purpose of the latter rule "was to provide fairness in the trial itself rather than to provide a deterrent to unlawful police action."

Judge Wisdom, for a unanimous court, held:

> In the light of Douglas's recognition of an indigent's "absolute" right to counsel on appeal and considering the dissenting justices' position that the apposite constitutional clause is the Due Process Clause, we hold that Douglas must be applied retrospectively. "The aim which justifies the existence of habeas corpus is not fundamentally different from that which informs our

criminal law in general, that it is better that a guilty man go free than that an innocent one be punished. * * * Schaefer, Federalism and State Criminal Procedure, 70 Harv.L.Rev. 1, 25 (1956). (341 F.2d at 776).

(The force of Pate v. Holman is not affected by the modification of that court's order as reported in 343 F.2d 546. See Collins v. Beto (5th Cir. 1965), 348 F.2d 823 at 830, in which recognition of that fact is made by the Fifth Circuit.)

The Fourth Circuit applied *Douglas* retrospectively in Magee v. Peyton (4th Cir. 1965), 343 F.2d 433, in a case involving the criminal appellate procedure of the State of Virginia, and in Puckett v. State of North Carolina (4th Cir. 1965), 343 F.2d 452, involving the appellate criminal procedure of the State of North Carolina. The Tenth Circuit made similar retrospective application in regard to a 1962 Oklahoma conviction in Chase v. Page, 343 F.2d 167. Neither of those Circuits felt extensive discussion necessary.

In People of the United States ex rel. Mitchell v. Fay, S.D.N.Y.1965, 241 F. Supp. 165, Judge Wyatt noted at the outset of his opinion that:

> At least since Griffin, it has been clear that a state cannot, in the administration of its appellate procedures, discriminate on the basis of the financial condition of the defendant; "[d]estitute defendants must be afforded as adequate appellate review as defendants who have money * * *." 351 U.S. at 19, 76 S.Ct. at 591. (241 F.Supp. at 167).

In holding that *Douglas* must be applied retrospectively to a 1952 New York conviction, Judge Wyatt cited Smith v. Crouse and other Supreme Court cases that made exactly the same retrospective application of *Douglas* as did that case. He held that:

> The Supreme Court, in at least three cases subsequent to *Douglas*, has reversed with a citation to *Douglas* state court convictions had before *Douglas*. All three were short, per curiam deci-

sions. Mr. Justice Harlan dissented in all three because he felt that the cases should be set for argument of the question of the retrospective effect of *Douglas.* Smith v. Crouse, 378 U.S. 584, 84 S.Ct. 1929, 12 L.Ed.2d 1039 (1964); Shockey v. Illinois, 375 U.S. 22, 84 S.Ct. 83, 11 L.Ed.2d 43 (1963); Daegele v. Kansas, 375 U.S. 1, 84 S.Ct. 89, 11 L.Ed.2d 44 (1963). This is a strong indication that Douglas v. People of State of California is to be given retrospective effect. The Court of Appeals for the Fifth Circuit has recently so held. Pate v. Holman, 341 F.2d 764 (1965). (241 F.Supp. at 168).

Other district court cases that applied *Douglas* retrospectively are Wright v. Bailey, E.D.N.C.1964, 228 F.Supp. 560; Kessinger v. State of Oklahoma, E.D.Okl. 1965, 239 F.Supp. 639; and Miller v. State of Oklahoma, E.D.Okl.1965, 240 F. Supp. 263.

State appellate courts other than the Supreme Court of Missouri that have examined the question subsequent to the Supreme Court's decision in Smith v. Crouse have independently reached the same conclusion as that reached by the federal courts in ·the cases just cited. The Supreme Court of Pennsylvania, for example, dealt with the question of whether *Douglas* should be applied to a 1954 murder conviction in Commonwealth ex rel. Stevens v. Myers, 419 Pa. 1, 213 A.2d 613. That court found it necessary to say only that:

> Stevens' right on direct appeal included the right to the assistance of counsel at this critical stage. Douglas v. People of State of California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Commonwealth v. Sliva, 415 Pa. 537, 204 A.2d 455 (1964). It is no bar that the pertinent events of Stevens' conviction occurred before the decision in Douglas v. People of State of California, supra. *Douglas* must be applied retroactively. Smith v. Crouse, 378 U.S. 584, 84 S.Ct. 1929, 12 L.Ed.2d 1039 (1964) (per curiam), reversing 192 Kan. 171, 386 P.2d 295 (1963); see Ruark v. Colorado, 378 U.S. 585, 84 S.Ct. 1935, 12 L.Ed.2d 1042 (1964) per curiam); Daegle v. Kansas, 375 U.S. 1, 84 S.Ct. 89, 11 L.Ed.2d 44 (1963) (per curiam); Herrera v. Heinze, 375 U.S. 26, 84 S.Ct. 90, 11 L.Ed.2d 44 (1963) (per curiam); Tabb v. California, 375 U.S. 27, 84 S. Ct. 90, 11 L.Ed.2d 44 (1963) (per curiam); Shockey v. Illinois, 375 U.S. 22, 84 S.Ct. 83, 11 L.Ed.2d 43 (1963) (per curiam); Ausbie v. California, 375 U.S. 24, 84 S.Ct. 87, 11 L.Ed.2d 43 (1963) (per curiam). (213 A.2d at 624–625).

In light of the almost unanimous retrospective application of *Douglas* by every court that has considered the question before *Linkletter, Tehan* and *Johnson,* we are convinced that we would err should we refuse to apply *Douglas* in this case. We cannot believe that the Supreme Court said or intended to say anything in *Linkletter, Tehan* and *Johnson* that would cause the Supreme Court to affirm the Kansas Supreme Court's decision in Smith v. Crouse in 1966 when in 1964 it determined the question was so clear that it summarily reversed that court over the protest of a single Justice who thought the question of retroactivity should be more fully argued. This Court will apply *Douglas* retroactively until it is directed by one of its controlling courts to hold otherwise.

### V.

We have not overlooked the direction of *Linkletter, Tehan* and *Johnson* that we must consider whether the administration of our criminal laws would be disrupted by the retrospective application of a particular constitutional principle. The impact of the retrospective application of *Douglas* must be measured by the consequences that follow such an application.

The orders of every federal court that has applied the principle of *Douglas* retrospectively have afforded the particular State appellate court involved the right to appoint appellate counsel and to again hear the petitioner's appeal on the merits. We know of no case, excepting only the unusual situation presented Judge Brown in Spaulding v. Taylor, supra (in which

the Territorial Court of Alaska had gone out of existence), in which the writ has issued before the particular State is given the opportunity to proceed in accordance with the Constitution. What all this means as a practical matter is that a particular State appellate court puts the case back on its docket for processing like any other case. The second review, of course, will be vastly different from the first because the State appellate court will be working with briefs and hearing arguments presented by counsel instead of struggling with the sometimes almost unintelligible and illegible handwritten presentations with which every court in the land is now familiar. We cannot believe that such a consequence can fairly be said to be a disruption of the administration of justice.

The following cases illustrate the routine manner in which State appellate courts have complied with retrospective applications of *Douglas* without any apparent disruption of the administration of the criminal law: State of Kansas v. Daegle (1962), 190 Kan. 613, 376 P.2d 807 (original appeal), Daegle v. Kansas, 375 U.S. 1, 84 S.Ct. 89, 11 L.Ed.2d 44 (reversed and remanded), Kan., 393 P.2d 978 (second appeal on the merits with appointed counsel); People of State of Illinois v. Shockey (1962), 25 Ill.2d 528, 185 N.E.2d 893 (original appeal), Shockey v. Illinois, 375 U.S. 22, 84 S.Ct. 83, 11 L.Ed. 2d 43 (reversed and remanded), People v. White, 30 Ill.2d 123, 195 N.E.2d 702 (appeal with appointed counsel); State of Kansas v. Cox (1963), 191 Kan. 326, 380 P.2d 316 and 191 Kan. 456, 381 P.2d 704 (original appeal), Cox v. Kansas, 376 U.S. 191, 84 S.Ct. 637, 11 L.Ed.2d 603 (reversed and remanded) 193 Kan. 571, 396 P.2d 326 (appeal with appointed counsel), Cox v. Kansas, 380 U.S. 982, 85 S.Ct. 1350, 14 L.Ed.2d 276 (cert. denied).

No one, of course, really knows how many cases will be influenced by or filed as a result of this case. Nor does anyone know whether the State of Missouri, acting through its Attorney General, will elect to proceed so far as suggesting that the Supreme Court of Missouri adopt procedures that will attack the backlog of cases that may be created. It is fortunate that the State of Missouri long ago provided adequate tools that can easily be utilized to avoid any serious disruption of the work of the Supreme Court of Missouri.

Art. V, § 6 of the 1945 Constitution of Missouri, V.A.M.S. empowers the Supreme Court of Missouri to "make temporary transfers of judicial personnel from one court to another as the administration of justice requires, and may establish rules with respect thereto." Rules 11.01 to 11.08 of the Supreme Court of Missouri, V.A.M.R. were promulgated pursuant to that constitutional power. Those rules provide for the utilization of appellate or trial judges who preside over courts with less burdensome dockets than that of the Supreme Court of Missouri. They even provide for the utilization of retired judicial personnel.

Our respect for and confidence in the Supreme Court of Missouri and in the Judiciary of Missouri generally forbids that we find that the administration of justice in Missouri would be disrupted if the Attorney General of Missouri asks the Supreme Court of Missouri to undertake the same task that other States have successfully carried out. Compared, for example, to what Florida was required to do after *Gideon* and its retrospective application and with what Illinois was required to do after Griffin v. People of State of Illinois, and its retrospective application, Missouri's task is simple in regard to *Douglas* and its retrospective application is a relatively simple one.[4]

---

4. Professor Edward H. Hunvald, Jr.'s excellent article, "A Dialogue on the Application of Federal Standards to Missouri Criminal Law," 30 Mo.L.Rev. 350 (Spring, 1965), demonstrates that except in particular marked areas, Missouri's traditional concern for individual liberty has placed this State in a much more favorable position than many of her Sister States so that retrospective application of other constitutional principles may not create as great a backlog in oth-

## VI.

Because the Supreme Court of Missouri may again hear petitioner's original appeal on the merits, we are required to make findings of fact in addition to those made in connection with the Douglas v. People of State of California point. Several factual questions were obviously presented in petitioner's Rule 27.26 motion originally filed in the State trial court. That court, however, refused to grant petitioner the evidentiary hearing constitutionally required by Townsend v. Sain, 372 U.S. 293 at 312, 83 S.Ct. 745, 9 L.Ed. 2d 770. As above noted, the Supreme Court of Missouri affirmed the trial court's denial of an evidentiary hearing in State v. Donnell, II.

Had the Supreme Court of Missouri construed its Rule 27.26 in the same manner that it did in State v. Pickel (Mo. 1964), 376 S.W.2d 181, and State v. Herren (Mo.1964), 376 S.W.2d 192, and in other cases cited in Russell v. Swenson, W.D.Mo.1966, 251 F.Supp. 196, this Court would not have been required to conduct the required evidentiary hearing.

The full factual situation developed at the evidentiary hearing held in this Court established that the Supreme Court of Missouri proceeded in both petitioner's appeals before that court on the erroneous factual assumption that petitioner had been represented by counsel at his arraignment. On the direct appeal it was stated as a fact that "[d]efendant, *represented by counsel,* entered a plea of not guilty and the cause was tried to a jury" (351 S.W.2d at 777, emphasis ours). On the 27.26 motion appeal, the Supreme Court of Missouri stated as a fact that petitioner's allegation that he "was arraigned without counsel" was not true. On page 510 of 387 S.W.2d, the Supreme Court of Missouri stated:

> We have obtained on the Court's own motion certified copies of the minutes of the proceedings prior to the last and final trial. These show the follow-

ing: "Monday, March 7, 1960—Arraignment continued to 3/16/60. Wednesday, March 16, 1960—Sidney Ruben appointed by Court as Attorney for Defendant. Pleads Not Guilty; Trial Set March 28, 1960. Monday, March 21, 1960—Erving Cooper appointed by Court as Attorney for Defendant. Sidney Ruben withdraws as attorney for defendant. Erving Cooper withdrawn as attorney for defendant. Jerome Kalishman appointed by Court as attorney for defendant. Wednesday, March 30, 1960—Continued to next term of Court for want of time to try—April 4, 1960—Monday, April 4, 1960—Continued for State—April 11, 1960." (387 S.W.2d at 510.)

On the same page the Supreme Court of Missouri made the following finding of fact:

> It is thus obvious that defendant was not arraigned without counsel, nor was he without counsel at any time thereafter. The record does not show, nor does defendant state, why two attorneys found it necessary to withdraw before trial.

The significance of that factual finding can be understood only in the light of the questions that petitioner attempted to present to the Supreme Court of Missouri. Among other questions, petitioner presented to that court the federal constitutional question of whether a proper application of the principles of Hamilton v. State of Alabama, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114; White v. State of Maryland, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193, and Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, had been abridged by reason of the fact that he had been arraigned without counsel. The Supreme Court of Missouri refused to reach that question because it held that:

> \* \* \* [T]he complete answer to this contention is that counsel *was* appointed for defendant at the time of his

er areas as might be created in other States. This data, of course, is relevant to the question of whether retrospective

application of *Douglas* is likely to disrupt the administration of justice in Missouri.

arraignment, as already demonstrated, and a plea of not guilty was entered. We have seen fit to ascertain the facts by means of a certificate supplementing both the present record and the record in the original criminal case No. 48601 (351 S.W.2d 775), which latter record we have also read and considered here. (387 S.W.2d at 512) (emphasis the Court's.)

The evidence produced at the hearing in this Court established beyond any reasonable doubt that the minutes of the trial court did not reflect what actually happened in regard to the appointment of counsel. Pages 64 to 76 of the transcript of November 30, 1965, were devoted to petitioner's allegation that he had never been represented by either Mr. Rubin or by Mr. Cooper, members of the St. Louis Bar, as the minutes of the Circuit Court of the City of St. Louis stated, and that the first lawyer appointed to represent him was Jerome Kalishman. Petitioner so testified (Tr. 73–74). We received in evidence a letter from Mr. Cooper that stated that he at no time had represented the petitioner in any case. We also received in evidence a letter and an affidavit from Mr. Rubin that he had never represented petitioner at any time. Counsel for the respondent agreed to check the accuracy of Mr. Cooper's and Mr. Rubin's letters and the affidavit and to stipulate that the transcript of all proceedings in Judge Nangle's court would be obtained and introduced in evidence (Tr. 72.)

At a second hearing held March 23, 1966, the Court noted that the Assistant Attorney General had received a letter from the Clerk of the Circuit Court advising that the original court reporter was dead and that the court reporter who inherited his notes stated that no reporter notes were taken at the arraignment. Counsel for the petitioner requested that respondent stipulate that Mr. Cooper and Mr. Rubin "did not, in fact, at any time represent the petitioner, * * * even though their names appear in the minutes of the Court * * *" (page 7 of the transcript of March 23, 1966).

We felt a still further effort should be made to locate the transcript. We stated:

The Court has indicated that it believes further inquiry should be made in connection with that question. Mr. McFadden has graciously indicated that he would have his office make a more careful follow-up to see whether or not notes were taken on March 7, 1960, March 16, 1960, and March 21, 1960, and that if he finds that such notes were taken will endeavor to have a transcript of those notes made and will transmit a copy of whatever transcript may be produced at this late date with a copy to Mr. Dominique so that he may review them, show them to the petitioner and make any objection to those notes being included in the record, if indeed Mr. Donnell wishes to make any objection. * * * The importance of this, of course, is that the parties are agreed in paragraph 4 [of their proposed stipulation] that Mr. Erving Cooper and Mr. Sidney Rubin did not in fact at any time represent the petitioner in the Circuit Court of St. Louis in State v. Donnell, No. 284–1, even though their names appear in the minutes of the court which are attached hereto as Exhibit 2. (Tr. 7–8.)

When doubt was expressed as to whether the transcripts could ever be found, the following colloquy took place:

THE COURT: Now, Mr. Dominique, have I correctly covered * * * the agreement that you and Mr. McFadden indicated was acceptable to you in our pretrial * * * or is there any necessity of adding anything additional to that?

MR. DOMINIQUE: Your Honor, it has been fully stated. There is one other point that I had * * * this may be a bit premature, but if we cannot find the [court reporter's] notes I would like to have a stipulation, if possible, that the petitioner was not represented by counsel in his arraignment in the Circuit Court of the City of St. Louis in Case No. 142–1. * * *

THE COURT: All right, now, Mr. McFadden, let me ask you, first without the addition, is what the Court has stated acceptable to Swenson, Warden?

MR. McFADDEN: Yes, Your Honor.

THE COURT: Now, are you willing, in the event we cannot find the notes, to stipulate, as requested by Mr. Dominique, that the petitioner in this case was not represented by any counsel at the arraignment?

MR. McFADDEN: Well, I am not prepared to make any statement concerning that at this time, one way or the other. I would like to see what the notes turn up if they can be found and then make a decision at that time.

THE COURT: I think that is perfectly satisfactory, and let me ask you this question. At the present time you have no knowledge of anyone that may have represented the defendant at the arraignment?

MR. McFADDEN: That is correct.

THE COURT: All right, I think this will clear up as we get our report on the search for the notes. (Tr. 8–10.)

On April 13, 1966, the Assistant Attorney General advised the Court that "no notes of the deceased reporter can be found." On the basis of the evidence adduced, we find as a fact that petitioner was not represented by counsel at the time of his arraignment and plea of not guilty.

It is obvious that we believe the questions concerning the applicability of Hamilton v. State of Alabama and White v. State of Maryland are open for determination. Professor Hunvald's discussion of those cases and the Missouri cases in his article "The Right to Counsel at the Preliminary Hearing," 31 Mo.L.Rev. 109 (Winter, 1966), demonstrates that question is not a frivolous one.

Avoidance of all avoidable friction between State and federal courts requires that we decide only that which we must decide and that whenever it is reasonably possible to permit the State courts to discharge their duty under Art. 6, cl. 2 of the Constitution of the United States before determining federal constitutional questions presented in particular cases before this Court.

Our ruling in regard to *Douglas* and its retrospective applicability to this case, and our order affords the Supreme Court of Missouri, if requested by the Attorney General of Missouri, the opportunity of deciding the Hamilton v. State of Alabama and White v. State of Maryland questions under the facts as we have found them. The federal question of whether those cases or either of them should be applied retrospectively is also open for decision.

Neither our citation of Professor Hunvald's article, which raises some substantial questions in regard to several recent decisions of the Supreme Court of Missouri, nor anything else we have said in this section of our opinion is intended to indicate our view in regard to the questions here discussed that will be before the Supreme Court of Missouri.

Pursuant to Rule 52(a) of the Rules of Civil Procedure, this opinion shall serve as our findings of fact and conclusions of law.

Attached to this opinion is a copy of an order consistent with the theory of the mandate of the Court of Appeals in *Bosler*. Within ten (10) days counsel for both parties shall indicate in writing their agreement or suggestions for modification.

It is so ordered.

### ORDER

For the reasons stated in our opinion of August 23, 1966, we find and determine that petitioner is entitled to the relief prayed in his application for writ of habeas corpus but that the writ shall not issue for a period of ninety (90) days in order to afford the State of Missouri, through its Attorney General, to make such application to the Supreme Court of Missouri as may be available under Missouri law, in either regular or extraordinary proceedings, with the right to request that petitioner make such joinder

therein as may be necessary under Missouri practice, to have the judgment affirming petitioner's conviction set aside or declared to be invalid, and to have counsel appointed and a review made of appellant's trial proceedings, equivalently as if this had originally been done.

If no such application is made to the Supreme Court of Missouri within the ninety (90) days allowed, the writ will issue. If such an application is made and proceedings thereon are had with due diligence, this Court will delay the issuance of the writ and hold the matter open until final action of the Supreme Court of Missouri is taken in connection with this case, and we shall thereafter make such disposition of this case as is called for by the then situation.

### ADDENDUM

Pursuant to the last paragraph of our memorandum, the parties filed suggestions for modification.

### I

Respondent suggests that, "The opinion should contain a determination that the petitioner did or did not request that a court having jurisdiction to do so appoint counsel to brief and argue his case on appeal."

■ The parties are agreed that petitioner filed a *pro se* motion in the Supreme Court of Missouri on December 7, 1960. That motion, captioned a "motion to sue in forma pauperis," alleged that petitioner "is not an attorney at law nor a student thereof and prays the Court to so consider"; that "he is without funds, money, real estate or relatives from whom sufficient money could be obtain [sic] to pay the filing fee nor [sic] to retain the services of competent and able counsel" and that "from all indications * * * he is without counsel appointed by the trial court"; and that "for these reasons he prays that he may proceed and have all rights accued [sic] to him as to those who are able to pay, and the right to withdraw this matter in the event he is mistaken his court appointed attorney is still in the case."

Respondent contends that petitioner's motion must be considered only as "an attempt to take such steps as might be necessary * * * to get his case up on appeal if his court appointed counsel is not doing anything on his behalf." Respondent contends that it is obvious that the paper cannot be construed as "conveying information to the Supreme Court [of Missouri] that petitioner was without counsel."

We reject respondent's contentions, not because they are presented as an afterthought, but because the undisputed facts establish that under "the State's system of justice [the Supreme Court of Missouri] reject[ed] a request for counsel or fail[ed] to take proper steps toward appointment of counsel for a convicted defendant when [it] ha[d] knowledge of the defendant's indigency and desire for appellate counsel," Pate v. Holman, 5 Cir. 1965, 341 F.2d 764, at 775.

We state our factual finding in the language of Pate v. Holman, originally cited on Page 330 of our memorandum opinion, because that case is one of the two cases relied on by respondent in support of his suggestion for modification. Neither that case nor Horton v. Bomar, 6 Cir. 1964, 335 F.2d 583, the other case relied upon by respondent, is in point because the factual situation presented in Pate v. Holman was still undetermined and because Horton v. Bomar did not even relate to an alleged refusal to appoint appellate counsel.

Chapman v. State of Texas, S.D.Tex. 1965, 242 F.Supp. 378, presented a factual situation comparable to this case. Chapman was sentenced in 1961. An appeal was taken to the Texas Court of Criminal Appeals. Prior to the hearing on appeal, Chapman filed a motion in which he alleged that he was "without legal counsel, or money, chattels, or assets to retain same"; that "a prima facie" case of denial of "Due Process of Law" has been made; and in which he moved "that Counsel be appointed to review, and correct the Application on file, and to represent the Petitioner hereafter on this Application(s)."

The respondent in *Chapman*, in a manner not dissimilar to that in this case, contended that what Chapman had said in his motion should not be considered as a request for appointment of counsel on appeal but that it should be construed only as a request for the appointment of counsel in one of Chapman's numerous applications for habeas corpus. The facts in *Chapman* were, if anything, more favorable to respondent's contention in that case than the facts presented by this case. In *Chapman* petitioner's motion was but a "part of a series of documents, all of which were grouped, by petitioner, under the general heading, "Petition for Writ of Habeas Corpus."

Judge Ingraham in *Chapman* noted, however, that "at the time these documents were filed, petitioner was seeking an appeal from his convictions" and that "whatever the nature of the remedy imagined or whatever the title applied thereto by the petitioner, it cannot be ignored that these papers were filed with the Texas Court of Criminal Appeals after that court had ruled that petitioner's appeal be noted, and before the appeal was heard."

*Chapman* held on the facts there involved, as we must hold on the facts here involved, that, "the proper authorities were aware that petitioner was proceeding in forma pauperis, and were put on notice of his desire for counsel by the motion which the petitioner filed." Judge Ingraham held that "a layman should not be penalized to the extent of a violation of his Constitutional rights because of the title he gives to the documents he files with a court" and that "to ignore petitioner's request for the appointment of counsel to handle the appeal, when it is known that petitioner is indigent, is to deprive petitioner [of his] Constitutional guarantees * * * [under] both the Due Process and Equal Protection Clauses."

That determination, of course, is consistent, if indeed not commanded, by Mr. Justice Robert's quarter-century-old admonition in Holiday v. Johnston, 313 U.S. 342, at 350, 61 S.Ct. 1015, at 1017,

85 L.Ed. 1392 (1940), that "a petition for habeas corpus ought not to be scrutinized with technical nicety." A more recent example of that frequently repeated admonition will be found in Sanders v. United States, 373 U.S. 1, at 22, 83 S.Ct. 1068, at 1080, 10 L.Ed.2d 148 (1963): "An applicant for relief ought not to be held to the niceties of lawyer's pleadings or be cursorily dismissed because his claim seems unlikely to prove meritorious." We recognize, of course, that both Holiday and Sanders were post-conviction cases. But what was said there is but a small part of what the Supreme Court has been writing on the wall for the last forty years in regard to the administration of criminal law. See Lumbard, "The Administration of Criminal Justice: Some Problems and Their Resolution," 49 A.B.A.J. 840 (September 1963) and Badger, "A judicial Cul-de-Sac: Federal Habeas Corpus for State Prisoners," 50 A.B.A.J. 629 (July 1964).

■ We have no doubt that *Sanders'* statement that judges are not to deny a "motion out of hand because the allegations are vague, conclusional, or inartistically expressed" is as applicable to appellate courts as it is to trial courts. Compare Case v. State of Nebraska, 381 U.S. 336, 85 S.Ct. 1486, 14 L.Ed.2d 422 (1965).

In *Chapman*, Judge Ingraham noted that the Texas Court of Criminal Appeals had commented on the fact that Chapman's brief had been prepared "without benefit of counsel familiar with the rules of procedure." The Supreme Court of Missouri went even further in *Donnell*. It recognized that it was apparent that Donnell's *pro se* brief was inadequate. There can be no question but that the Supreme Court of Missouri had full knowledge that petitioner was in fact indigent. (See 351 S.W.2d at 780.)

■ We agree with Ingraham's opinion that "the failure to appoint an attorney to prosecute petitioner's appeal under these circumstances is a violation of petitioner's rights under the Four-

teenth Amendment to the Constitution of the United States."

Two of the cases cited in our original memorandum opinion specifically hold that applications from known indigent laymen are not to be construed narrowly. See Magee v. Peyton, 4 Cir. 1965, 343 F.2d 433, at 435, in which retrospective application of Douglas v. State of California was made on the basis of a letter written by the defendant's father and Puckett v. State of North Carolina, 4 Cir. 1965, 343 F.2d 452, in which the question of competency of counsel was remanded for evidentiary hearing because of counsel's failure to advise the defendant of his rights under Griffin v. People of State of Illinois. The latter case added, "Doubtlessly, the request for a transcript might well have suggested to court [the Supreme Court of North Carolina] the need to assign counsel, which has since been declared an obligation. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed. 811 (1963)."

■ In response to respondent's suggestion for modification, we therefore add to our findings of fact that petitioner's motion must be read as a specific request for the appointment of counsel; that the Supreme Court of Missouri was fully advised by that motion and otherwise that petitioner was an indigent; that such court recognized that petitioner's *pro se* brief was inadequate; and that it was with all that knowledge the Supreme Court of Missouri refused to have appellate counsel appointed for petitioner on his direct appeal. We make no modification of our conclusions of law.

## II

Petitioner joins the respondent in the suggestion that this court decide the questions concerning the applicability of Hamilton v. State of Alabama and White v. State of Maryland, discussed in Section VI of our original memorandum opinion. We shall not make any modification of our original opinion for the reasons we have already stated in detail. We direct attention to the general dis-

cussion of the long history, developed on a case-by-case basis, of the doctrine of federal abstention in Fay v. Noia, 372 U.S. 391, at 417–426, 83 S.Ct. 822, 9 L.Ed. 2d 837 (1963). See also our public expression of confidence in the courts of Missouri in Post-Conviction Applications, 39 F.R.D. 281 at 294 and 298. Because of our factual finding, it is unnecessary at this time to anticipate the question of whether a request for appellate counsel under other factual circumstances may or may not be necessary to invoke the principles of *Douglas* and *Donnell*.

For the reasons stated, the suggestions for modification are denied except to the extent stated in this addendum and the order attached to our original memorandum opinion will this day be entered.

It is so ordered.